

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

FRANCINE DORSEY, as Personal )
Representative of the Estate of Olivia Dorsey, )
Deceased, )
     )
         Plaintiff, )
     ) **Case No. 01 C 2552**
v. )
     ) **Magistrate Judge Ian H. Levin**
CITY OF CHICAGO, )
     )
         Defendant. )
     )

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant City of Chicago's (hereinafter "City") motion for summary judgment in the cause. For the reasons herein set forth, the Court grants the City's motion for summary judgment.

## BACKGROUND FACTS

### I. INTRODUCTION

Olivia Dorsey, (hereinafter "Dorsey"), deceased, began working for the City's Department of Law as a Legal Typist on March 3, 1980. (Bryden Aff. ¶ 3.) In 1988, she became an Administrative Legal Clerk and continued in that position through 1999. (Def.'s Resp. to Pl.'s LR56.1(b)(3)(B) St. ¶ 1.) As an Administrative Legal Clerk, some of Dorsey's principal responsibilities included data entry, collating paperwork, tracking seminar expenditures, and tracking the City's tort judgment report.[1] (Id., Pl.'s Resp. to Def.'s LR56.1(a)(3) St. ¶¶ 12-14.)

---

[1]The tort judgment report consists of a record of all settlements and judgments paid by the City. (Def.'s Resp. to Pl.'s LR56.1(b)(3)(B) St. ¶ 1.)

The City rated Dorsey's work performance principally as "excellent" from 1990 through 1996. (*See* Pl.'s Ex. 4.)

Angelina Fuentes (hereinafter "Fuentes") was Dorsey's immediate supervisor from 1997 through 1999. (Pl.'s Resp. to Def.'s LR56.1(a)(3) St. ¶ 10.) Sherry Bryden (hereinafter "Bryden") is the Director of Personnel Policies and Utilizations and the Americans with Disabilities Act (hereinafter "ADA") liaison who has worked for the City's Department of Law since 1991. (Bryden Aff. ¶ 1.)

## II.     DORSEY'S IMPAIRMENTS

Dorsey suffered from diabetes for twenty years and had vascular disease or "hardening of the arteries" related to her diabetes. (Ruder Dep. of 5/25/04 at 55:7-14, 65:11-66:3.) She also suffered from chronic lymphedema which caused poor circulation in her legs and prevented her from walking long distances continuously and standing for extended periods of time. (*Id.* at 55:19-56:2, 303:14-21, 348:8-24, 394:19-395:19, Pl.'s Ex. 36 at P00604.)

In May of 1997, Dorsey had a heart attack and suffered multiple embolic strokes (hereinafter "stroke") during a coronary angiogram performed at that time. (Pl.'s Ex. 29 at D01168.) The stroke resulted in a significant neurological deficit which "show[ed] up as recent memory loss." (*Id.*) A mental status examination administered after the stroke indicated that Dorsey had deficits in recall, attention, language and practice. (Def.'s Resp. to Pl.'s LR56.1(b)(3)(B) St. ¶ 7.) Subsequent testing, performed three months later, showed that she had "a definite decline in mental functioning associated with decreased memory, language function, concentration, mental efficiency, and . . . mental flexibility." (*Id.*) Dorsey was unable to learn in the three to five months following her stroke because her ability to recall recent events was severely limited (Ruder Dep. of 5/25/04 at 324:7-14)

2

and she could not concentrate because it involved short-term memory tasking. (Def.'s Resp. to Pl.'s LR56.1(b)(3)(B) St. ¶ 8.) She was also unable to process and retain new information. (*Id.*)

Although Dorsey's stroke caused short-term memory loss, it had little effect on her long-term memory. (Def.'s Resp. to Pl.'s LR56.1(b)(3)(B) St. ¶ 9.)

## III. ADMINISTRATIVE LEGAL CLERK POSITION (1997 TO 1999)

Dorsey initially returned to work in June of 1997, but because she was having difficulty her performing her Administrative Legal Clerk position, she requested an additional medical leave of absence. (Def.'s Resp. to Pl.'s LR 56.1(b)(3)(B) St. ¶ 14, Fuentes Dep. at 100:12-18, Pl.'s Ex. 13 at D00381-83.) The City granted Dorsey's request and extended her leave until September of 1997. (*Id.*)

Dorsey returned to full-time work on September 29, 1997 even though Dr. Ruder was concerned that she "still ha[d] some significant memory loss and may have trouble at work." (Pl.'s Ex. 10 at D01316-17.) Upon Dorsey's return to her position as Administrative Legal Clerk, she exhibited difficulty completing her job tasks which included *inter alia* remembering her computer password and how to perform certain computer tasks such as saving a file from a hard drive to a disk. (Def.'s Resp. to Pl.'s LR 56.1(b)(3)(B) St. ¶ 15.)

Dorsey received a rating between "marginal" and "good" on her performance evaluation for the period of September 29, 1997 through December 31, 1997. (Def.'s Ex. B at 000193.) Fuentes, Dorsey's supervisor during the relevant period, noted *inter alia* problems with the accuracy of Dorsey's data entry, a marked increase in the number of errors in Dorsey's work output, Dorsey's difficulty using various software programs and her inability to use computer programs with which she had familiarity. (*Id.*) Fuentes also indicated that Dorsey required close supervision and exhibited

difficulty in following specific instructions. (*Id.*)

In January of 1998, Dorsey completed a form requesting a reasonable accommodation in which she indicated she needed a larger computer screen for her diabetic retinopathy. (Def.'s Ex. B at D01964-66.) The City granted Dorsey's request and she also received additional lights in her work area, a glare screen for her computer, a back support for her chair, and a foot rest. (Pl.'s Resp. to Def.'s LR56.1(a)(3) St. ¶¶ 29, 32.) Dorsey was also provided with additional computer training. (*Id.* ¶ 30.)

Dorsey received a rating of "marginal" on her performance evaluations covering the periods of January 1, 1998 through June 30, 1998 and July 1, 1998 through December 31, 1998. (Def.'s Ex. B at 000194-95.) On these evaluations, Fuentes, again documented *inter alia* Dorsey's problems with data entry accuracy, her difficulty with using various computer software programs, and her need for close supervision. (*Id.*) Fuentes noted that Dorsey was unable to retain information after requesting help for a specific problem and she made repeated requests for help for the same problem. (*Id.*) She also indicated that Dorsey did not "exhibit independent problem-solving skills, and as a result require[d] close supervision." (*Id.* at 000194.) Fuentes further documented the fact that Dorsey could not "complete routine job functions without assistance or intervention from others." (*Id.*)

Fuentes began documenting problems with Dorsey's job performance in the form of "employee incident reports." (Def.'s Resp. to Pl.'s LR56.1(b)(3)(B) St. ¶ 16.) For example, on December 30, 1998, Fuentes forwarded an employee incident report to her supervisor describing errors made by Dorsey and requesting disciplinary action. (Pl.'s Ex. 17 at D01780-81.) Dorsey was subsequently suspended for one day on January 20, 1999 for "[u]nacceptable work performance, [which included] various mistakes within all areas of [Dorsey's] job responsibilities." (Pl.'s Ex. 18

4

at D00457, D01951.)

On May 20, 1999, Fuentes gave Dorsey a memorandum delineating the areas of her job performance that still needed improvement. (Def.'s Ex. H at D00471.) The memorandum indicated there were at least four job performance areas in which Dorsey needed improvement. (*Id.*) Some of these areas included data entry accuracy, retention of computer training, and proper procedures in requesting leave. (*Id.*)

Because Dorsey was experiencing memory problems which were impacting her ability to perform her job[2], she inquired about an accommodation to her Administrative Legal Clerk position. (Pl.'s Ex. 15 at D01621- 22, Pl.'s Ex. 21 at D01156-57.) Fuentes gave Dorsey a memorandum dated August 2, 1999 stating that Dorsey would need to obtain a statement from her physician which in essence explained her medical condition and how it impacted her ability to perform her job. (Pl.'s Ex. 21 at D01157.) The memorandum states in pertinent part:

> In response to your memo . . . regarding specific medical information being requested from your doctor, listed below are some of the required functions of your job that you had been unable to perform accurately and independently:
>
> While using QuattroPro, you are unable to remember how to update your hard drive from a floppy disk even after repeated instruction.
>
> You frequently transpose numbers while performing simple data entry tasks.
>
> You are unable to retain information regarding general office practices and procedures, i.e., how to open the combination safe, dispensing petty cash, etc.
>
> You exhibit difficulty with routine transactions being entered in CAPS and will often phone others for assistance in completing the transaction.
>
> If you are unable to perform these essential duties due to medical complications (as

---

[2]In July of 1999, Dorsey acknowledged that there was something wrong with her memory. (Pl.'s Ex. 15 at D01621-22.)

5

you've stated) and are requesting medical accommodation, I need . . . you to obtain a statement from your doctor explaining your medical condition and how it prevents you from doing your job, how long . . . this condition [will] last, and what . . . the consequences . . . [are for your] performing . . . [the] above-mentioned duties. You will then need to complete and submit the proper request for accommodation forms. (Pl.'s Ex. 21 at D01157.)

Dr. Henry J. Ruder, M.D., Dorsey's treating physician, provided the City with a medical report dated August 10, 1999. (Pl.'s Ex. 10 at D01310-11.) The medical report states in pertinent part:

This is in response to a memorandum dated August 2, 1999 from Angie Fuentes, Finance Officer, City of Chicago, Department of Law.

Olivia Dorsey reported to me that she has been having troubles at work. I asked her to have her work place send me a memo documenting and reporting things that have been noticed about her work performance.

I received a memo dated August 2, 1999 from Angie Fuentes. This memo outlines at least four problems that were identified by Ms. Fuentes. These problems basically involve memory tasks.

Attached to this note are copies of my correspondence and office notes related to Olivia Dorsey's medical condition. In this packet of data are the return to work letters sent to the City of Chicago. In addition, there is a specific letter dated June 12, 1997 where I state that the patient may exhibit problems with recent memory, and I advised that her work place monitor her carefully for appropriateness and accuracy during her first start-up days. I myself had initiated this and I know that at that same time, I had talked to Angie Fuentes concerning this situation. I am also pretty sure that I talked to Sherry Bryden as well concerning Olivia Dorsey's medical condition and memory loss problems.

In addition, I have documentation in my office notes of having talked to Angie Fuentes on June 24, 1997. I had Olivia's permission to talk to her. Ms. Fuentes reported to me that Olivia [was] "markedly impaired" and could not remember passwords, etc., . . . It was at that time that I dictated an office note. I am sure that I sent a copy of this office note to her work since this is the reason this letter was done on June 24, 1997.

I am quite satisfied that I had really informed Olivia Dorsey's managers concerning her memory loss. I had recommended to them that she would require special effort

on their part to help keep her on track and to help her with memory problems.

Olivia Dorsey's medical condition has improved over the last two years. Her memory loss, I believe, is better but is still a significant factor in her behavior. An example is the most recent [visit] to my office where she basically did not remember why she had memory loss and had forgotten the event surrounding her hospitalization at Northwestern Memorial Hospital in May 1997. My overall conclusion is that Olivia Dorsey, though improved, still has significant memory loss related to her medical problems that were encountered in May 1997. (Pl.'s Ex. 10 at D01310-11.)

After receiving Dr. Ruder's medical report, Fuentes would not discuss Dorsey's request for

accommodation because Dr. Ruder had not answered the questions she delineated in her August 2,

1999 memorandum[3] and because the proper accommodation forms had not been completed. (Def.'s

Resp. to Pl.'s LR56.1(b)(3)(B) St. ¶¶ 24-25; Fuentes Dep. at 165:13-23.)

On August 31, 1999, Fuentes gave Dorsey a memorandum detailing the efforts made to assist

her in performing the essential functions of her Administrative Legal Clerk position. (Def.'s Ex. B

at D01296.) The memorandum states in pertinent part:

The Department of Law has gone to great lengths to help you perform the essential functions of your position. You have received several (individual and group) training sessions on how to use your computer and the basics of data entry for reports. You have been given computer manuals from training classes and a computer template plus you also have your notes from the various training sessions. Even though you have been given these tools, frequently you are still unable to do the simplest of tasks without asking for assistance. Olivia, this is unacceptable. You are required to consistently perform all of your duties at an acceptable level. If improvements are not made, you will be subject to discipline.

If you believe that you have a disability and need an accommodation to perform your job, you must request it on the proper forms. Attached are the necessary forms that must be completed along with a copy of your job description. If you wish, Dr. Ruder may assist you in completing the forms. Dr. Ruder, or another physician, should submit, along with your request, a statement of what your condition is, how long it

---

[3]Fuentes received a follow-up memorandum from Dr. Ruder, dated September 17, 1999, which answered all of the questions in her August 2, 1999 memorandum. (Def.'s Resp. to Pl.'s LR56.1(b)(3)(B) St. ¶ 25.)

is expected to last and the duties that you cannot perform and/or need an accommodation to perform.

I received a Medical Report from Dr. Henry J. Ruder, dictated August 10, 1999, in response to my memorandum of August 2, 1999. Unfortunately, Dr. Ruder did not answer any of the questions outlined in my memorandum.

If and when you have submitted your request, the Department will review your request and make a decision whether to grant the accommodation . . . Please note, a request to not have to perform your essential job functions will not be granted. (Def.'s Ex. B at D01296.)

As of September 17, 1999, Dr. Ruder opined that Dorsey "has a permanent disability related to her [short-term] memory, and this will not improve." (Ruder Dep. at 248:16-249:12.)

Dorsey was suspended a second time for poor performance in October of 1999. (Pl.'s Ex. 22 at D01552, Pl.'s Ex. 23 at D01959-60.) Fuentes's October 4, 1999 "Statement of Charges" indicated Dorsey had continuous problems with receiving reports, problems with not being able to save and copy seminar reports properly, and problems retrieving documents from the computer's directory. (Pl.'s Ex. 22 at D01552.) Dorsey received a three-day suspension. (*Id.* at D01959-60.)

Dr. Ruder sent a letter dated October 6, 1999 to the City which stated: "Olivia Dorsey has a permanent disability related to her diabetes." (Pl.'s Ex. 24 at D01304.) Fuentes, however, subsequently indicated in a October 12, 1999 memorandum to Dorsey that Dr. Ruder's October 6, 1999 letter was insufficient and further informed Dorsey that she must request an accommodation using the proper forms. (Pl.'s Ex. 25 at D01131.)

In a City document, Dr. Ruder represented that Dorsey was continuously and totally disabled from "October 19, 1999 to unknown." (Pl.'s Resp. to Def.'s LR56.1(a)(3) St. ¶ 63.)

Dorsey requested a medical leave of absence on October 23, 1999. (Pl.'s Ex. 26 at D01285.) Dorsey identified her medical problems as "cellulitis of the right leg which causes swelling from the

foot through the knee, diabetes (mellitus) [and] stroke injury." (*Id.*) The City granted Dorsey's request. (*Id.*)

On October 26, 1999, Dr. Ruder completed a Certification of Physician or Practitioner form for the City and recommended that Dorsey take a disability leave of absence for three months starting in October of 1999. (Def.'s Ex. F at 000050-51.) He noted that Dorsey's medical condition was probably permanent. (*Id.* at 000050.) Dr. Ruder indicated that Dorsey was not able to perform the functions of her position. (*Id.*)

Dorsey completed a form requesting a reasonable accommodation to her Administrative Legal Clerk position on January 19, 2000. (Pl.'s Ex. 28 at D01272-74.) Dorsey specifically requested "[a] change in job that would require rote behavior" (*Id.* at D01272) due to "memory loss that varies from time to time." (*Id.* at D01273.) In her request, Dorsey noted she had difficulty remembering computer log-on sequences, computer passwords and computer program requirements necessary to update reports. (*Id.*) Thus, Dorsey indicated that her current job functions had to be memorized and she need a job that would not "require accurate memory skills from moment to moment." (*Id.* at D01274.)

Dr. Ruder submitted another medical report to the City on January 21, 2000. (Pl.'s Ex. 29 at D01168.) His medical report states in pertinent part:

> Olivia Dorsey has significant diabetes mellitus which affects many part of her body. The most important side effect of her diabetes is vascular disease, particularly to her coronary artery circulation. The patient ha[d] [a] myocardial infarction in May 1997 and was required to have a coronary angiogram. During the course of the coronary angiogram, a shower of emboli was released, and the patient suffered multiple embolic strokes. As a result of this central nervous injury, the patient has had a persistent, significant neurological deficit which shows up as recent memory loss. The patient has been in therapy but in spite of this, has had persistent significant memory loss. This memory loss is most noteworthy for [her] inability to remember

recent events. I believe that this is the cause of the patient's inability to properly perform her work at the City of Chicago law offices. She has difficulty remembering passwords and how to operate certain equipment. She will have problems with tasks that require a recall of various procedures etc.

I think that it is reasonable for Olivia Dorsey to apply for accommodation in her job. It would be best if she could be placed in a position that would require more repetitive action and less memory tasking. I would be happy to discuss all of this with the law department and Olivia's employers as necessary.

This letter is in follow up to several letters [I] have written over the last two years concerning her medical condition. (Pl.'s Ex. 29 at D01168.)

The City denied Dorsey's request for a reasonable accommodation. (Pl.'s Ex. 28 at D01275.) The City based its denial decision on the following reasons: "Both Ms. Dorsey and her Doctor state that she is not able to perform functions that require memory tasks. Ms. Dorsey cannot perform the essential functions of her position of Administrative Legal Clerk." (*Id.*) Dorsey subsequently remained on a medical leave of absence. (Def.'s Resp. to Pl.'s LR56.1(b)(3)(B) St. ¶ 31.)

## IV.    COURT FILE CLERK POSITION (2000)

On February 14, 2000, Dorsey contacted Bryden by letter to reiterate her request for a job change. (Pl.'s Ex. 30 at D01169.)

Bryden sent Dorsey a letter, dated March 9, 2000, in which she offered Dorsey a Court File Clerk position with the Department of Law as an accommodation. (Pl.'s Ex. 32 at D01170-71.) Dorsey worked as a Court File Clerk for only one day on April 17, 2000 because *inter alia* she was unable to perform the physical demands of the job.[4]   (Def.'s Ex. J at D03626.)

---

[4]A Court File Clerk is essentially responsible for pulling files from a docket room, loading a cart with the files, transporting the cart about a block to courtrooms, delivering files to various courtrooms, picking up files from the courtrooms at the end of the day and distributing files to other employees. (Def.'s Resp. to Pl.'s LR56.1(b)(3)(B) St. ¶ 39.)

In regard to the Court File Clerk position, Dorsey stated that she was "completely unable
(continued...)

Subsequent to leaving the Court File Clerk position, Dorsey never returned to work. (*See* Pl.'s Exs. 33 at D01226, 38 & 39.) Instead, she requested and was granted multiple medical leave of absences by the City. (*Id.*)

## V. CHARGE OF DISCRIMINATION

On December 4, 2000, Dorsey filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission alleging that she had been discriminated against by the City on the basis of her disability. (Pl.'s Ex. 50 at D01142.) She received a notice of her right to sue in federal court and subsequently instituted the subject lawsuit. (Pl.'s Ex. 51 at D01133.)

## LEGAL STANDARDS

## I. SUMMARY JUDGMENT

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party had produced evidence to show that it is entitled to summary judgment, the party seeking to avoid such judgment must affirmatively demonstrate that a genuine issue of material fact remains for trial. *LINC v. Fin. Corp. v. Onwuteaka*, 129 F.3d 917, 920 (7th Cir. 1997).

In deciding a motion for summary judgment, a court must "review the record in the light most

---

[4](...continued)

to do this job." (Def.'s Ex. J at D03626.) She indicated that she was "unable to push the cart" across the street, that "pushing the cart hurt (her) feet" and that she "g[ot] chest pains" from the intensity of her duties. (*Id.*) In addition, Dorsey had difficulty performing the computer tasks required of the Court File Clerk position. (Pl.'s Ex. 33 at D01229.)

favorable to the nonmoving party and to draw all reasonable inferences in that party's favor." *Vanasco v. National-Louis Univ.*, 137 F.3d 962, 964 (7th Cir. 1998). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Nevertheless, the nonmovant may not rest upon mere allegations, but "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). *See also Linc*, 129 F.3d at 920. A genuine issue of material fact is not shown by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, 106 S.Ct. 2505 or by "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505, 91 L.Ed.2d 202.

This standard is applied with added rigor in employment discrimination cases, where issues of intent and credibility often dominate. *See Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1038 (7th Cir. 1993). "[S]ummary judgment is improper in a discrimination case where a material issue involves any weighing of conflicting indications of motive and intent." *Stumph v. Thomas & Skinner, Inc.*, 770 F.2d 93, 97 (7th Cir. 1985)(*citing Kephart v. Inst. of Gas Tech.*, 630 F.2d 1217, 1218 (7th Cir. 1980)). Finally, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Freeman v. Madison Metro. Sch. Dist.*, 231 F.3d 374, 379 (7th Cir. 2000)(*quoting Anderson*, 477 U.S. at 255, 106 S.Ct. 2505, 91 L.Ed.2d 202).

## II.   AMERICANS WITH DISABILITIES ACT

The Americans with Disabilities Act (hereinafter "ADA") prohibits discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). In addition, the ADA "also provides that an employer discriminates against a qualified individual with a disability by 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability.'" *McPhaul v. Bd. of Comm'rs of Madison County,* 226 F.3d 558, 563 (7th Cir. 2000)(*quoting* 42 U.S.C. § 12112(b)(5)(A)).

Under the ADA, a plaintiff may demonstrate discrimination by presenting evidence of disparate treatment or by showing a failure to accommodate. *Sieberns v. Wal-Mart Stores, Inc.,* 125 F.3d 1019, 1021-22 (7th Cir. 1997). In a failure to accommodate case, as herein, a plaintiff must show that: (1) she was disabled; (2) her employer was aware of her disability; and (3) she was a qualified individual who, with or without reasonable accommodation, could perform the essential functions of the employment position.[5] *Basith v. Cook County,* 241 F.3d 919, 927 (7th Cir. 2001); *McPhaul,* 226 F.3d at 563.

## ANALYSIS

The City brings the subject motion for summary judgment asserting *inter alia* that Dorsey was not qualified to perform the essential functions of her Administrative Legal Clerk position with or without reasonable accommodation. (Def.'s Mem. at 12-13, Def.'s Reply at 5-7.) The City further avers that it provided Dorsey with reasonable accommodations to her Administrative Legal Clerk

---

[5]In failure to accommodate claims, the *McDonnell-Douglas* burden-shifting framework is "unnecessary and inappropriate." *Weigel v. Target Stores,* 122 F.3d 461, 464 (7th Cir.1997) (citation omitted).

position. (Def.'s Reply at 11-15.)

Plaintiff Francine Dorsey (hereinafter "Plaintiff"), on the other hand, asserts *inter alia* that Dorsey was a qualified individual who was able to perform the essential functions of the Court File Clerk position and could have continued working if accorded basic accommodations. (Pl.'s Resp. at 12-13.) Thus, Plaintiff contends that the City violated the ADA by refusing to provide Dorsey with a reasonable accommodation by reassigning Dorsey to the Court File Clerk position, by refusing to consider accommodations that would allow Dorsey to continue working as a Court File Clerk, and by failing to consider reassigning Dorsey to a vacant position that she was capable of performing. (*Id.* at 13-14.) Plaintiff also avers that, with regard to the Administrative Legal Clerk position, Fuentes testified that Dorsey was capable of performing the essential functions of that position. (*Id.* at 12 n.1.)

The ADA only protects a "qualified individual with a disability." 42 U.S.C. § 12111(8). As is pertinent here, to be a "qualified individual with a disability," a plaintiff must be "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds . . ." (*Id.*) To determine whether someone is a "qualified individual with a disability," courts apply a two-step test. 29 C.F.R. § 1630.2(m). "First, we consider whether 'the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc.'" *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 563 (7th Cir. 1996)(*quoting* 29 C.F.R. § 1630.2(m)). "If he does, then we must consider 'whether or not the individual can perform the essential functions of the position held or desired, with or without reasonable accommodation.'" *Id.* A determination of whether an individual is a "qualified individual with a disability" is made at the

time of the employment decision. *Id.* A plaintiff bears the burden of proof and must be able to demonstrate that she is a "qualified individual with a disability" in order to successfully prosecute a claim under the ADA. *Id. (citing DeLuca v. Winer Indus., Inc.,* 53 F.3d 793, 797 (7th Cir. 1995)).

Herein, the parties do not question or dispute Dorsey's background.[6] Rather, at issue is Dorsey's ability to perform the essential functions of the Administrative Legal Clerk position.[7]

Both Plaintiff and the City agree that the essential functions[8] of the Administrative Legal Clerk position are set forth in the City's job description. (Pl.'s Resp. to Def.'s LR56.1(a)(3) St. ¶ 14, Def.'s Resp. to Pl.'s LR56.1(b)(3)(B) St. ¶ 1.) Some of the essential functions of Dorsey's position as Administrative Legal Clerk included: (1) data entry, (2) collating paperwork, (3) tracking seminar expenditures, and (4) tracking the City's tort judgment report. (Pl.'s Resp. to Def.'s LR56.1(a)(3) St. ¶¶ 12-14, Def.'s Resp. to Pl.'s LR56.1(b)(3)(B) St. ¶ 1.) Dorsey was also responsible for preparing and processing payments to vendors, entering invoices into the computer automated processing system, and assisting in preparing and processing the Department of Law's payroll register. (*Id.*) Dorsey spent about eight-five percent of her time entering data from invoices into a computer, ten percent of her time tracking expenditures for tort seminars and tort settlements, and five percent of her time collating paperwork. (Pl.'s Resp. to Def.'s LR56.1(a)(3) St. ¶ 14.)

---

[6]Dorsey held the position of Administrative Legal Clerk since 1988. (Def.'s Resp. to Pl.'s LR56.1(b)(3)(B) St. ¶ 1.) Prior to Dorsey's stroke in 1997, the City rated her work performance as principally "excellent." (*See* Pl.'s Ex. 4.)

[7]Plaintiff avers that the relevant position at issue herein is the Court File Clerk position and that Dorsey is capable of performing the essential functions with or without reasonable accommodations. (Pl.'s Resp. at 9.) Thus, Plaintiff asserts that the adverse employment action occurred when the City sent Dorsey home from her Court File Clerk position. (*Id.* at 12 n.1.)

[8]Essential functions are "the fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2.

## I. DORSEY WAS UNABLE TO PERFORM THE ESSENTIAL FUNCTIONS OF THE ADMINISTRATIVE LEGAL CLERK POSITION.

After reviewing and considering the evidence presented in this case, the Court finds that Dorsey was unable to perform the essential functions of her position as Administrative Legal Clerk. The Court bases this finding, in part, on Dorsey's own admission which is found in the request for reasonable accommodation form she submitted to the City dated January 19, 2000. (Pl.'s Ex. 28 at D01272-74.) When Dorsey completed her request for a reasonable accommodation to her Administrative Legal Clerk position, she stated she needed "[a] change in job that would require rote behavior" (Pl.'s Ex. 28 at D01272) and, in essence, indicated that she was unable to perform her Administrative Legal Clerk position because she had memory loss due to her stroke which prevented her from remembering her computer log-on sequence, computer password and various computer program requirements which were necessary to update reports she work on. (*Id.* at D01273.) She further indicated that she needed "[a] job that d[id] not require accurate memory skills from moment to moment." (*Id.* at D01274.) Thus, Dorsey's request for a reasonable accommodation, which entailed a request to be placed in a different City position, constitutes an admission on her part that she was unable to perform the essential functions of the Administrative Legal Clerk position because she could not operate her computer which she was required to do in order to perform the essential functions of her position. *See e.g., Sieberns,* 125 F.3d at 1022 ("Because [the plaintiff] admits that he could not perform the clerk/sales associate position with or without reasonable accommodation, he is not a 'qualified individual with a disability,' and cannot prevail on . . . [his] reasonable accommodation claim.").

The Court further bases its finding that Dorsey could not perform the essential duties of the

Administrative Legal Clerk position on Dr. Ruder's medical reports and assessments. For example,

Dr. Ruder prepared a medical report for the City on January 21, 2000 in which he stated that Dorsey

"had a persistent, significant neurological deficit which shows up as recent memory loss." (Pl.'s Ex.

29 at D01168.) He indicated that Dorsey's "memory loss is most noteworthy for [her] inability to

remember recent events." (*Id.*) Dr. Ruder further reported that, "I believe that this is the cause of

the patient's inability to properly perform her work at the City of Chicago law offices. She has

difficulty remembering passwords and how to operate certain equipment. She will have problems

with tasks that require a recall of various procedures, etc." (*Id.*) He also stated that "[i]t would be

best if [Dorsey] could be placed in a position that would require more repetitive action and less

memory tasking." (*Id.*) Dr. Ruder provided other medical reports and assessments to the City and,

in one assessment, he stated, "Olivia Dorsey has a permanent disability related to her diabetes." (Pl.'s

Ex. 24 at D01304; *see also* Pl.'s Ex. 10 at D01316-17, Pl.'s Ex. 10 at D01310-11, Pl.'s Resp. to

Def.'s LR56.1(a)(3) St. ¶ 63, Def.'s Ex. F at 000050-51 & Ruder Dep. at 248:16-249:12.) In light

of Dr. Ruder's medical assessment of Dorsey, it was clear that she could not perform the essential

functions of the Administrative Legal Clerk position because she did not possess the requisite short-

term memory recall needed to perform the computer functions associated with this position.

In addition to Dr. Ruder's medical opinion, Dorsey's inability to perform the essential

functions of her position was clearly based on the various disciplinary violations that were

documented in the form of employee incident reports, performance evaluations where she typically

received a "marginal" rating and memorandums delineating those areas that were deficient and

required improvement. (*See* Def.'s Ex. B at D01296, 000193, 000194-95, Def.'s Ex. H. at D00471,

Pl.'s Ex. 17 at D01780-81, Pl.'s Ex. 18 at D00457, D01951, Pl.'s Ex. 21 at D01157, Pl.'s Ex. 22 at

D01552, Pl.'s Ex. 23 at D01959-60.) These disciplinary actions and memorandums typically noted *inter alia* Dorsey's difficulty with data entry accuracy and remembering how to use various computer programs as well as her need for close supervision. (*See id.*)

It also bears noting that Dorsey represented to the Social Security Administration (hereinafter "SSA") (Def.'s Ex. T at D03650-53) and private insurance companies that she was totally disabled from working[9] (Def.'s Ex. E at D03628 & D03630) and, moreover, Dr. Ruder also represented to private insurance companies that Dorsey was totally disabled from working. (Def.'s Ex. V at D02132, Def.'s Ex. W at D02145, Def.'s Ex. X at D02092, & Def.'s Ex. Y at D02067.) Dorsey was ultimately awarded disability benefits by the SSA and a determination was made by the SSA that she was disabled as of August 17, 2001.[10] (Def.'s Ex. D03653.) Relevant case law, however, instructs that "[a] plaintiff may declare that she was totally disabled in her SSDI [Social Security Disability Insurance] application, then declare that she was a qualified individual under the ADA, but she must show that this apparent inconsistency can be resolved with reference to variance between the definitions of 'disability' contemplated by the ADA and SSDI." *Feldman v. Am. Mem'l Life Ins. Co.,* 196 F.3d 783, 791 (7th Cir. 1999); *see also Lee v. City of Salem, Ind.,* 259 F.3d 667, 677 (7th Cir.

---

[9]On the private insurance applications Dorsey responded affirmatively that she was totally disabled and "prevented from performing any work or engaging in any occupation for remuneration or profit." (Def.'s Ex. E at D03628 & D03630.)

Dorsey also represented, at one point, that she was not totally disabled. (Pl.'s Ex. 55 at D04112.)

[10]Dorsey was initially denied disability benefits based on the Social Security Administration's (hereinafter "SSA") determination that she "still ha[d] the ability to do light unskilled work. " (Pl.'s Ex. 54 at D03737.) The SSA further indicated that Dorsey's "condition prevent[ed] her from doing [her] past job(s) . . . " (*Id.*)

Dorsey alleged in her application that she was disabled since October 17, 1999, due to diabetes and memory loss. (Def.'s Ex. T at D03651.)

2001)("The only legitimate explanations that the Court recognized [in *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795, 802-05, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999)] were those turning on the distinct legal (and sometimes temporal) contexts of these claims . . . a plaintiff must explain the apparent discrepancy with reference to the divergent treatments of disability reflected in the SSA [Social Security Act] and ADA.")

Herein, Plaintiff has failed to provide an explanation as to how Dorsey's representations to the SSA that she was "disabled" under the Social Security Act and the allegations she brings herein under the ADA that Dorsey is a "qualified individual" who can perform the essential functions of her job with or without reasonable accommodation are consistent. Rather, Plaintiff avers that Dorsey represented that she was unable to work so that she could obtain disability benefits.[11] (Pl.'s Resp. at 13 n.2.) This explanation, however, is insufficient. *Lee*, 259 F.3d at 674 ("[T]he plaintiff must proceed from the premise that [her] previous assertion of an inability to work was true, or that he in good faith believed it to be true, and he must demonstrate that the assertion was nonetheless consistent with his ability to perform the essential functions of [her] job.") Moreover, to the extent that Dorsey explanation means that she was forced to make "the Hobson's choice of disability or poverty," the Seventh Circuit has rejected this as a legitimate basis for making contradictory representations regarding a plaintiff's ability to work. *Id.* at 678. Therefore, because Plaintiff has failed to produce affirmative evidence that demonstrates Dorsey could perform the essential

___

[11]Plaintiff cites to *Flowers v. Komatsu Mining Systems, Inc.*, 165 F.3d 554, 557 (7th Cir. 1999) for the proposition that her representations of total disability "while relevant" are "not determinative." The Court finds *Flowers* to be factually distinguishable from and unlike the issue(s) herein. The holding in *Flowers*, actually was that a Social Security benefits disability finding does not preclude an ADA finding and that the Social Security finding is relevant to the ADA finding (It is some evidence of the plaintiff's ability to perform the essential functions of a job).

functions of the Administrative Legal Clerk position with or without reasonable accommodations, her ADA claim is unavailing. *Weigel,* F.3d at 468 ("[w]hen a defendant in an ADA action relies on such representations as the basis for contending that a plaintiff is not a 'qualified individual,' the plaintiff is free to come forward with additional evidence that shows she could perform the essential duties of a desired position with or without reasonable accommodation notwithstanding the fact that she might have been deemed disabled under some other statutory or contractual framework," but "absent some such affirmative showing of the plaintiff's ability to perform the essential functions of the position, there will be no genuine issue of material fact as to whether the plaintiff is a 'qualified individual' and the employer will be entitled to judgment as a matter of law.")

Accordingly, the Court finds that Dorsey could not perform the essential functions of the Administrative Legal Clerk position. *See e.g., Feldman,* 196 F.3d at 791 ("[w]hen employees (and/or their physicians) represent that they are 'totally disabled,' 'wholly unable to work,' or some other variant to the same effect, employers and factfinders are entitled to take them at their word.")(*citing Weigel,* 122 F.3d at 467).

## II. THE CITY PROVIDED DORSEY WITH REASONABLE ACCOMMODATIONS.

During the time period following Dorsey's stroke, when Dorsey and Dr. Ruder represented that she could not perform the Administrative Legal Clerk position due to memory loss, the City provided Dorsey with reasonable accommodations to aid her in performing the essential functions of the Administrative Legal Clerk position. For example, in January of 1998, Dorsey received a larger computer screen she requested due to her diabetic retinopathy. (Pl.'s Resp. to Def.'s LR56.1(a)(3) St. ¶ 32, Def.'s Ex. B at D01964-66.) She also received additional lighting in her work area, a glare screen for her computer, a back support for her chair, and a foot rest. (Pl.'s Resp. to

Def.'s LR56.1(a)(3) St. ¶ 29.) *See* 42 U.S.C. § 12111(9)(B)(reasonable accommodations may include job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities).

The City further provided Dorsey with additional computer training. (Pl.'s Resp. to Def.'s LR56.1(a)(3) St. ¶ 30.) She attended several individual and group training sessions on how to use her computer and the basics of data entry for reports.[12] (Def.'s Ex. B at D01296, Fuentes Dep. at 133:1-16.) Dorsey was also given computer manuals from training sessions and a computer template. (Def.'s Ex. B at D01296.) *See* 42 U.S.C. § 12111(9)(B).

The City also went as far as providing Dorsey with extraordinary accommodations or, in other words, accommodations that went beyond those which are reasonably contemplated by the ADA. Despite these extraordinary accommodations, Dorsey was still unable to perform the essential functions of the Administrative Legal Clerk position. (Fuentes Dep. at 63:10-17.) Fuentes testified that Dorsey was unable to perform the essential functions (e.g., data entry of invoices, tort settlement payments and seminar expenditures) required of her position unless she exercised "extreme supervision" over Dorsey's work. (*Id.* at 63:18-22, 64:12-18.) This meant that Fuentes spent one to four hours each day (after Dorsey returned to work following her stroke) in 1997 to 1999 monitoring Dorsey's output for accuracy. (*Id.* at 63:23-64:11.) Fuentes stated that Dorsey was unable to perform any function that required the use of a computer (*Id.* at 64:12-18) and ninety percent of

---

[12]For example, Dorsey attended Quattro Pro training on August 31, 1998 and September 1, 1999. (Pl.'s Resp. to Def.'s LR56.1(a)(3) St. ¶ 30.) She had previously attended Quattro Pro training and had also received personal training on this same software. (*Id.*)

Dorsey's work contained errors. (*Id.* at 65:2-66:24.) Fuentes testified she had to personally work with Dorsey every day to refresh her memory regarding *inter alia* data entry, logging into her computer, retrieving files, and inserting calculations. (*Id.* at 134:13-139:24.) In addition, Fuentes stated that Dorsey would also ask other City employees to help her with logging into her computer. (*Id.* at 137:20-138:22.)

Plaintiff avers, however, that Fuentes testified that Dorsey could perform the essential functions of the Administrative Legal Clerk position. (Pl.'s Resp. at 12 n.1, Fuentes Dep. at 154:10-155:7.) The Court finds Plaintiff's assertion without merit because while Fuentes may have testified that Dorsey was not physically incapable of performing some of the essential functions of Administrative Legal Clerk position (Fuentes Dep. at 154:21-155:7, 64:19-66:24), she also specifically stated that ninety percent of Dorsey's work as to data entry of invoices, tort settlement payments and seminar expenditures contained errors and Dorsey was not able to perform the essential functions of her position *unless* she exercised "extreme supervision" over Dorsey's work. (*Id.* at 63:10-22, 65:2-66:24.)(emphasis added). Because Fuentes's "extreme supervision" does not constitute a reasonable accommodation under the ADA, the City was not required to provide it. *See e.g., Hammel v. Eau Galle Cheese Factory,* No. 03-3578, 03-3678, 2005 WL 1163688, at *10 (7ᵗʰ Cir. May 11, 2005)("[T]he ADA does not require an employer to accommodate a disabled employee by making special, individualized training or supervision available in order to shepherd that employee through what is an essential and legitimate requirement of the job."); *see also Cochrum v. Old Ben Coal Co.,* 102 F.3d 908, 913 (7ᵗʰ Cir. 1996)("reasonable accommodation does not encompass reallocation of essential job functions)(citation omitted).

Accordingly, the Court finds that despite the fact that the City provided Dorsey with

extraordinary accommodations beyond those required under the ADA, she was unable to perform the essential functions of the Administrative Legal Clerk position.[13]

## III. THE CITY WAS NOT REQUIRED TO PROVIDE DORSEY WITH AN ALTERNATIVE POSITION UNDER THE FACTS HERE.

Plaintiff contends that the City violated the ADA by unreasonably reassigning her to the Court File Clerk position and by refusing to consider accommodations that would allow her to continue working as a Court File Clerk. (Pl.'s Resp. at 13-14.) Thus, Plaintiff's claim here is that Dorsey was able to perform the essential functions of the Court File Clerk position with or without reasonable accommodations and she could have continued working if she had been afforded basic accommodations. (Id. at 13.) The Court, however, finds Plaintiff's assertions without merit.

Herein, because Dorsey was unable to perform the essential functions of the Administrative Legal Clerk position, the City offered her the Court File Clerk[14] position as an accommodation. (Pl.'s Ex. 32 at D01170-71.) Dorsey accepted the position and worked as a Court File Clerk for only one day on April 17, 2000 because she represented that she was "completely unable to do this job" since inter alia she could not perform some of essential functions (i.e., physical aspects) of that position.[15]

---

[13]It also bears noting that the City granted Dorsey's requests for medical leaves of absence after her stroke in 1997. (Pl.'s Ex. 13 at D00381-83, Pl.'s Ex. 26 at D01285.) See e.g., Walsh v. United Conveyor Corp., 222 F.Supp.2d 997, 1004 (N.D. Ill. 2002)("a temporary LOA [leave of absence] can be a reasonable accommodation under the ADA depending on the circumstances.")

[14]The City worked with the union to waive the posting and bidding process for the Court File Clerk position, and any grievances that might have arisen from the City placing Dorsey in the vacant Court File Clerk position. (Def.'s Ex. D at 000061.) The City also agree to allow Dorsey to maintain the same salary she had been paid in her Administrative Legal Clerk position as in her new Court File Clerk position. (Id.)

[15]A Court File Clerk is responsible for pulling files from a docket room, loading a cart with the files, transporting the cart about a block to courtrooms, delivering files to various courtrooms, picking up files from the courtrooms at the end of the day and distributing files to
(continued...)

(Def.'s Ex. J at D03626.) The City, however, had no legal duty under the ADA to provide Dorsey with this alternative accommodation or reassignment to the Court File Clerk position. *See e.g., Schmidt v. Methodist Hosp. of Indiana, Inc.,* 89 F.3d 342, 344 (7th Cir. 1996)("[e]mployers cannot deny an employee alternative employment opportunities reasonably available under the employer's existing policies, but they are not required to find another job for an employee who is not qualified for the job he or she is doing.")(*citing Sch. Bd. of Nassau County, Fla. v. Arline,* 480 U.S. 273, 289 n.19, 107 S.Ct. 1123, 94 L.Ed.2d 207 (1987)). Thus, because Dorsey was not qualified to perform the essential functions of the Administrative Legal Clerk position, the City had no legal obligation to provide her with the Court File Clerk position. Besides, Dorsey could not perform the essential functions of the Court File Clerk position with or without reasonable accommodations.[16]

---

[15](...continued)
other employees. (Def.'s Resp. to Pl.'s LR56.1(b)(3)(B) St. ¶ 39.)

In regard to the Court File Clerk position, Dorsey stated that she was "completely unable to do this job." (Def.'s Ex. J at D03626.) She indicated that she was "unable to push the cart" across the street, that "pushing the cart hurt (her) feet" and that she "g[ot] chest pains" from the intensity of her duties. (*Id.*) In addition, Dorsey had difficulty performing the computer tasks required of the Court File Clerk position. (Pl.'s Ex. 33 at D01229.)

[16]Plaintiff's assertion that the City could have provided Dorsey with reasonable accommodations to the Court File Clerk position is speculative and does not present "reasonable" accommodations. (Pl.'s Resp. at 14.) Initially, for example, Plaintiff avers that the City could have provided Dorsey with a motorized cart, hired a personal assistant to push the cart, or asked another Court File Clerk to push the cart. (*Id.* at 14.) *See e.g., Cochrum v. Old Ben Coal Co.,* 102 F.3d 908, 913 (7th Cir. 1996)("reasonable accommodation does not encompass reallocation of essential job functions.") With respect to the computer tasks required of the Court File Clerk position, Plaintiff asserts that the City could have provided Dorsey with a computer that did not require a password or could have purchased technology that would allowed her to log on to a computer without a password. (Pl.'s Resp. at 14.) The Court finds Plaintiff's assertions speculative. *See e.g., Basith v. Cook County,* 241 F.3d 919, 930 ("[The plaintiff's] assertion that a wheelchair would accommodate his inability to perform delivery of medications is sheer speculation."); *see also Nicholas v. Acuity Lighting Group, Inc.,* No. 1:03 CV 1005-DFH-TAB, 2005 WL 280341, *8 (S.D.Ind. Jan. 4, 2005)("The burden remains on the employee to show that a reasonable accommodation was possible.")(*citing Rehling v. City of Chicago,* 207 F.3d 1009,
(continued...)

Plaintiff's other contention that the City violated the ADA by failing to consider reassigning Dorsey to a vacant position that she was capable of performing is equally unavailing. (Pl.'s Resp. at 14.) Initially, it bears noting that "reassignment to a vacant position" is one possible type of accommodation under the ADA. 42 U.S.C. § 12111(9)(B); 29 C.F.R. § 1630.2(o)(2)(ii). In *Gile v. United Airlines, Inc.*, 95 F.3d 492 (7th Cir. 1996), the Seventh Circuit recognized "that the ADA *may* require an employer to reassign a disabled employee to a different position as reasonable accommodation where the employee can no longer perform the essential functions of their current position." *Id.* at 498. (emphasis added). The Seventh Circuit qualified that general rule by "emphasiz[ing] that, along with the other requirements a disabled employee must meet under the ADA to be entitled to reasonable accommodation, there are significant limitations on an employer's potential obligation to reassign a disabled employee as reasonable accommodation," which include that "[t]he ADA may only require an employer to reassign a disabled employee to a position for which the employee is otherwise qualified." *Id.* at 499. Moreover, "[a]n employer may be obligated to reassign a disabled employee, but only to vacant positions" and the reassignment to a different position "must not impose an 'undue hardship.'" *Id.* (*citing* 42 U.S.C. § 12112(b)(5)(A)).

The City, here, not only offered Dorsey the Court File Clerk position as a reasonable accommodation, but once it was clear that she could not perform the essential functions of that position, the City continued to try to work with her by providing her with extensive information on the availability of other City positions.[17] (*See e.g.*, Def.'s Ex. B, Attach. No. 14, Def.'s Ex. B at

---

[16](...continued)
1015-16 (7th Cir. 2000)).

[17]On May 29, 2001, the City sent Dorsey a letter stating that the City was "attempting to identify a position [Dorsey] would be capable of performing given [her] experience and any
(continued...)

D01108-16.) Thus, contrary to what Plaintiff argues, the City did consider reassigning Dorsey to vacant City positions. Herein, while Plaintiff argues there were vacant positions that Dorsey could be assigned to fill, she has failed to carry her burden in demonstrating that "vacant position[s] exist for which [s]he was qualified." *Ozlowski v. Henderson*, 237 F.3d 837, 840 (7th Cir. 2001)(*citing Rehling v. City of Chicago*, 207 F.3d 1009, 1015 (7th Cir. 2000)). (Pl.'s Resp. at 14; Def.'s Resp. to Pl.'s LR56.1(b)(3)(B) St. ¶¶ 67-69, Bryden Aff. ¶¶ 5-14.)

Accordingly, Plaintiff has failed to establish that Dorsey was a qualified individual who could perform the essential functions of the Administrative Legal Clerk position or other vacant positions with or without reasonable accommodation.[18] *See e.g., Basith*, 241 F.3d at 930-32; *Cochrum*, 102

---

[17](...continued)
medical limitations [she] might have." (Def.'s Ex. B, Attach. No. 14.) The letter also contained eight job descriptions and requested updated information on Dorsey's medical condition. (*Id.*) Because the City did not receive a response from Dorsey, it sent her another letter dated June 21, 2001 requesting that her doctor review the eight job descriptions and specify which duties within the job descriptions she was capable of performing. (Def.'s Ex. B at D01108-16.) The City followed up again with another letter to Dorsey dated August 24, 2001 in an effort to obtain the medical information it needed to consider her for possible reinstatement. (Def.'s Ex. O, Attach. No. 1.)

In 2001, the City encouraged Dorsey to apply for the position of a file clerk with the City's Police Department, however, she did not pursue it. (Dorsey Dep. of 6/11/04 at 131:21-132:9.)

In the summer of 2003, one of the City's attorneys verbally informed Dorsey of several job vacancies for which she could be considered. (Kaplan Aff. ¶ 4.) These positions included Intake Aide, Clerk II and Clerk III. (*Id.*) Dorsey was given the job descriptions for these positions; however, she never contacted the City to pursue these positions. (*Id.*)

[18]In Dorsey's amended complaint, she alleges that the City violated the ADA by "causing a breakdown in the interactive process following Ms. Dorsey's one day as a Court File Clerk by refusing to engage in meaningful discussion to identify an accommodation or more suitable position for Ms. Dorsey." (Am. Complt. ¶ 40.) The Court finds Dorsey's allegation that the City violated the ADA by causing a breakdown in the interactive process without merit because assuming *arguendo* that the City was required under the ADA to provide Dorsey with an alternative position, the Court finds that the City did, in good faith, engage in an interactive process as to the Court File Clerk and twelve other positions. (*See* footnote 17.)

F.3d at 913.

## CONCLUSION[19]

Based on the foregoing, the City's motion for summary judgment is granted and the cause

is dismissed with prejudice.


ENTER:

_Ian H. Levin_

**IAN H. LEVIN**
**United States Magistrate Judge**


Dated: June 6, 2005

---

[19]In view of the Court's ruling herein, it is deemed unnecessary to consider the City's other arguments raised herein that (1) Dorsey's disability discrimination allegations as they relate to the Administrative Legal Clerk position are time-barred because they occurred prior to February 8, 2000 (more than 300 days from the date of the contested employment action) and (2) Dorsey's disability discrimination allegations as they relate to the Court File Clerk position are barred because they are outside the scope of the Charge of Discrimination. For the same reason, it is unnecessary for the Court to rule on the City's Motion to Strike.